UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATRINA SWINTON & DEIDRA ROBINSON,
On her own behalf and on behalf of her                06-CV-6139T
minor child JAYE STEWART,
                                    Plaintiffs,      **DECISION**
v.                                                   **AND ORDER**

GEORGE B. FAZEKAS,
                                    Defendant.
_____

## INTRODUCTION

This is an action for monetary damages, injunctive relief and declaratory relief brought by plaintiffs Katrina Swinton ("Swinton") and Deidra Robinson ("Robinson") as well as Robinson's minor child, Jaye Stewart (collectively "plaintiffs"), all of whom plaintiffs claim were denied housing by defendant, George Fazekas ("defendant" and/or "Fazekas") based upon familial status and race discrimination[1] in violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. and Title VIII of the Civil Rights Act of 1968, as amended and because of their sexual orientation in violation of N.Y. Exec. Law §§ 290 et seq. Defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking an Order dismissing plaintiffs' complaint.

## BACKGROUND

Defendant purchased 1209 Culver Road, a 2-family house, in 1984 and resided in the lower apartment until approximately 1989.

---

[1] Plaintiffs' complaint originally included an allegation of discrimination based upon race. However, plaintiffs have withdrawn their race discrimination claim since discovery has shown no evidence of racial discrimination.

From 1985 to 1989, while living in the downstairs apartment, there were no more than two tenants who occupied the upstairs apartment. One tenant was a female with a 2 year old son who was there for approximately 12 years. However, she was asked to leave after the apartment was damaged by her puppies. As a result of the tenant's puppies, there was a urine smell in the apartment and damage to the woodwork. Another woman with a young daughter between the ages of 2 and 3 also moved into the downstairs apartment in November 2002. In addition, defendant had three college-aged females that were tenants in the upstairs apartment. He claims that he did not know their relationship to each other. Further, defendant rented to two graduate students for at least a year. Before moving out, one of the tenants asked if they could get a dog that would stay in the apartment until they moved out. The tenant explained that it would be a mature, house-broken dog. The tenants found a dog that lived in the apartment for a few weeks before they moved out. This was the only other dog that defendant could recall, aside from the puppies owned by the previous tenant.

    Plaintiffs allege in the complaint that on or about October 9, 2005, Swinton responded to an online rental ad posted by defendant and that after viewing the property and talking to defendant, plaintiffs were ultimately denied a lease on October 17, 2005 for discriminatory reasons.

Swinton and Robinson's relationship began in July 2004. At that time, Robinson together with her son Jay, lived with her grandparents.[2] In the fall of 2005, plaintiffs were searching for an apartment in Rochester. On October 9, 2005, Swinton submitted an application online for a rental property owned by defendant.[3] Accordingly, the first contact defendant had with plaintiffs was when he was notified by Rent Rochester, an online rental website, that there was a prospective tenant. The rental application form submitted by Swinton indicated that the co-applicant was her girlfriend, Robinson with Jaye Stewart as the third occupant. Swinton also stated they had no pets. On the same day, Swinton received an e-mail reply to her application from defendant wherein he asked Swinton to provide more information about the other two people in her household.[4] Plaintiffs replied to defendant's e-mail and gave him additional information about Robinson's income and ability to pay rent. They also informed defendant that the third person in their household was a two-year old boy. Defendant and plaintiffs set an appointment to view the apartment and it was confirmed in an e-mail dated October 10, 2005.

---

[2]After defendant did not rent the apartment to plaintiffs in October 2005, plaintiffs continued to stay at Robinson's grandparents' house until their relationship ended in March 2006.

[3]The ad stated that the property was a two-bedroom apartment that was one-half of a double. The rent was $550.00 a month and pets were allowed.

[4]In the e-mail, Fazekas indicated: "I have two apartments for rent. I have had problems renting to 3 people in the past. When one leaves the remaining members have had trouble paying the rent. Could you please tell me about your roommates-their work and age, etc."

Defendant claims that his usual procedure for renting to a tenant was to have a fair amount of dialogue with the tenant so that the tenant could get to know him and know how much he cared about the property and its appearance. According to defendant, he wanted to make sure that the prospective tenants would treat the property as their own. In addition, he was concerned about stability of employment, why the tenants wanted an apartment, the reasons they left their previous place and how they like the neighborhood, which was particularly important because it was a very busy street. Defendant, however, did not provide a written questionnaire and did not do reference checks.

Prior to the face-to-face meeting, plaintiffs and defendant had a phone conversation regarding the apartment. In that phone conversation, defendant asked Robinson about the sleeping arrangements of the plaintiffs' household. The defendant basically asked who was going to sleep in each room. Robinson explained that her son was to have one room and that she and Swinton would share the other bedroom. Defendant then stated that he did not see how that would work and asked if one of them was going to sleep on the floor. There is a dispute as to what occurred next, however Robinson claims she informed defendant that she and Swinton were in a romantic relationship and so they would share a bed. At his deposition, defendant claimed that after his phone conversation

with Robinson, he did not understand that Robinson and Swinton were in a romantic relationship.

On October 11, 2005, plaintiffs met with the defendant who showed them the apartment. Swinton informed the defendant that they wanted to rent the apartment and that since the upstairs tenant previously had a dog, they were thinking about getting a puppy in the future. The defendant replied he would have to think about it and they would have to pay a bigger security deposit if they got a puppy in the future. Although he advertised the apartment as "Pets Allowed," defendant claims he did not want a puppy in the apartment. According to defendant, he asked Swinton if "there [was] anyway I can get you to re-consider?" but she was determined that if she was going to get a dog it was going to be a puppy, and that she would be getting one after they moved in. Defendant states that he perceived Swinton as inflexible on the issue of getting a puppy. Plaintiffs dispute this fact and state that at no time did either Swinton or Robinson indicate to the defendant that they were set on getting a dog. In fact, plaintiffs were searching for apartments without regard to whether or not pets were allowed and would have gone to see the apartment even if it had been advertised as "no pets."

On October 13, 2005, plaintiffs e-mailed defendant reiterating that they were very interested in the apartment and could have the security deposit by next Friday. The next day, the defendant

replied that he was going to review the application and think about it over the weekend. He also indicated that at that point plaintiffs were "the strongest contenders for the lower apartment." After not hearing from defendant, plaintiffs e-mailed him once again on October 17, 2005. Defendant responded the same day informing plaintiffs that he would not be renting the apartment to them. The defendant stated in the e-mail as follows:

> Katrina and Deidra – I've given your interest in the apartment a great deal of consideration and I'm sorry yo say that I don't think it would be a good match given your particular needs. My reservations are based on past experience with dogs and I must say that I am also concerned with the added liability of a young child. I truly however do wish you success in finding a home that will best fit your needs.
> George

According to defendant, he was concerned about the issue of lead paint, however, he did not deny plaintiffs as tenants because of that concern, or any concern about the liability of a child. Defendant ultimately rented the apartment to Champagne Anderson, a single female.

## DISCUSSION

### I. **Summary Judgment Standard**

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party

seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.) "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." See Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.1996)(citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. See Anderson, 477 U.S. at 249; see also, Fed.R.Civ.P. 56(e). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." See Leon v. Murphy, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. See Fed.R.Civ.P. 56(e); see also U.S. v. Diebold, Inc., 369 U.S. 654 (1962).

## II. **Fair Housing Act Claim**

The Fair Housing Act ("FHA"), as amended, makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status or national origin." See 42 U.S.C. § 3604(a). Claims of housing discrimination involving disparate treatment, under the FHA are analyzed under the familiar McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003); Reg'l Econ. Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2003), cert. denied, 537 U.S. 813 (2002).

Under this scheme, plaintiffs must first make out a prima facie case of discrimination. See Mitchell, 350 F.3d at 49. To make out a prima facie case of housing discrimination, plaintiffs must establish that: (1) they are members of a protected class; (2) they applied for and were qualified for the housing opportunity; (3) they were rejected; and (4) the housing opportunity remained available. See Robinson v. 12 Lofts Realty, 610 F.2d 1032, 1038 (2d Cir.1979); (applying Title VII burden shifting analysis of McDonnell Douglas to FHA claim); see also Cabrera v. Jakabovitz, 24

F.3d 372, 381 (2d Cir.1994); Walker v. Cox, 1997 WL 177854, at *3 (E.D.N.Y. 1997). Proving a *prima facie* case requires only a de minimis showing that there exists a triable issue of fact. See Quarantino v. Tiffany & Co., 71 F.3d 58, 65-66 (2d Cir. 1995) ("plaintiff's burden of proof in a discrimination action is de minimis at the *prima facie* stage[.]")

Once the plaintiffs make out a *prima facie* case, then the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for their decision. See Reg'l Econ., 294 F.3d at 48-49. If defendants meet that burden, "the McDonnell Douglas framework ... disappear[s] and the sole remaining issue [is] discrimination vel non." See id. (quoting Reeves, 530 U.S. at 142-43. Plaintiffs "must then prove that the defendant intentionally discriminated against them on a prohibited ground" i.e. pretextual reason. See id. (citing Reeves, 530 U.S. at 143).

### A.   Plaintiffs' *Prima Facie* Case

Defendant argues that plaintiffs have failed to establish a *prima facie* case under the FHA for various reasons. While defendant concedes that Robinson and her biological child Jaye fall within the definition of familial status under the FHA, defendant claims that Swinton does not fall within the purview of those protected in the familial status[5] class either by definition or by what policy

---

[5] Familial status is defined as "one or more individuals (who have not attained the age of 18 years) being domiciled with ... a parent[.]" See 42 U.S.C. § 3602(k)(1).

9

would dictate. Defendant contends that because Swinton is not a biological parent of Jaye and has not adopted him or been appointed a guardian, she lacks standing to bring a claim under the FHA. Defendant further contends that while plaintiffs may have been financially qualified, their insistence on having a puppy in the apartment and their inflexible attitude rendered them unqualified.[6] Accordingly, defendant claims that plaintiffs cannot prove that they were qualified to rent the apartment.

The Court concludes, viewing the evidence in a light most favorable to plaintiffs, that they have established a *prima facie* case. They were members of a protected class who were qualified to rent the apartment at 1209 Culver Road and who were rejected in their bid to do so, after which the apartment was rented to another applicant.

**B.   Legitimate Non-discriminatory Reason and Pretext**

Having found that plaintiffs have established a *prima facie* case of discrimination, the Court turns to defendant's evidence of a legitimate non-discriminatory reason for rejecting them as tenants. Defendant argues that the reason he did not rent to plaintiffs was because he was informed by the plaintiffs of their plans to get a puppy and they then appeared to him to be inflexible

---

[6] Defendant states that plaintiffs informed him of their plans to get a puppy, and due to his prior bad experience, ownership of a puppy was a disqualifying factor for tenants. However, the description of the apartment mentions that "Pets [are] Allowed."

on this issue.[7] Defendant claims that he simply created a reasonable limitation which precluded tenants from having puppies in the apartment, he observed a reaction in them that indicated inflexibility on this issue and it was for this reason that plaintiffs were denied the apartment. For the purpose of this motion, the Court will accept the proffered reason as meeting the defendant's burden under McDonnell Douglas, to come forward with a nondiscriminatory reason for his decision. Nevertheless, the Court cannot find that plaintiffs will be unable to persuade a fact finder that the proffered reason was untrue and that familial status discrimination was the true reason behind the decision not to rent the apartment to plaintiffs.

It is undisputed that the defendant sent Robinson and Swinton an e-mail dated October 17, 2005 informing them that he was not going to rent to them based on his concern over the added liability of having a small child in the household. All a jury needs to do to find the defendant in violation of the FHA is to take him at his own word. See United States v. Grisham, 818 F.Supp. 21, 23 (D.Me. 1993) (Court found that familial status was an uncontroverted factor in the decision not to rent and in preference statements).[8]

---

[7] Defendant claims that he had a prior bad experience when he allowed a puppy in the apartment, and he articulated that to Swinton. He argues that he perceived that she intended to get a puppy and would not be persuaded otherwise.

[8] In Grisham, the landlord admitted that he "informed [tenant] that the property was less suitable for tenants with small children than those with older children or no children ..." and that he has told his rental agents that, although they were not to exclude families with suitable children, "the property [was] more suited to people without children." The Court concluded that these statements indicated a "preference" based on familial status, which is a

Despite the October 17 e-mail sent by defendant, he now claims that it was not his concern over the child that led him to refuse to rent to plaintiffs. Rather, defendant contends that plaintiffs' apparent intent on getting a puppy was the reason for his refusal to rent to plaintiffs. Further, defendant argues that it was his perception that plaintiffs would be intransigent on this issue and that they would generally be inflexible as tenants that led him to his ultimate decision. The Court agrees with plaintiffs that this presents a factual dispute which can only be resolved by a jury. The issue of whether defendant's claim that he refused to rent the apartment to plaintiffs because of his concerns over a dog was a pretext for discrimination given that neither Swinton nor Robinson owned a dog at the time and also that the ad for the apartment clearly indicated "Pets [were] Allowed" precludes summary judgment.

In addition, plaintiffs need not demonstrate that discrimination based upon familial status was the sole reason they were denied housing, only that it was a motivating factor in the defendant's decision. See Robinson, 610 F.2d at 1042. There are material facts in dispute in this case including the issue of whether the presence of Robinson's son in the plaintiffs' household was one of the reasons that the defendant did not rent the apartment to plaintiffs and whether either Swinton or Robinson informed the defendant that they were set on getting a puppy once

---

violation of the FHA.

they moved into the apartment. The prevailing view with respect to FHA claims is that discriminatory intent is not a required element, and that the FHA may be violated by practices that have discriminatory effects. See Soules v. U.S. Dept. of Housing & Urban Dev., 967 F.2d 817, 822 (2d Cir. 1992) (In stating claim under FHA, plaintiff need allege "only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent") (quoting U.S. v. Yonkers Bd. of Educ., 837 F.2d 1181, 1217 (2d Cir.1987)); Robinson, 610 F.2d at 1036. Thus, the differing accounts from the parties as to what occurred also raises material questions of law precluding summary judgment as to plaintiffs' familial status claim.

### III. Sexual Orientation Claim

Discrimination based on sexual orientation is not covered under the Federal Housing Act, however, it is included as a protected class under New York Executive Law § 296.[9] Accordingly, the McDonnell Douglas burden-shifting test is still applicable. See Brennan v. Metro. Opera Assoc., 284 A.D.2d 66, 70 (1st Dept. 2001). Defendant contends that plaintiffs cannot establish a *prima facie* case of discrimination based on sexual orientation because he had

---

[9] Section 296(5)(a)(1) and (3) relate to housing and provide that "[i]t shall be unlawful discriminatory practice for the owner ... or other person having the right to sell, rent or lease a housing accommodation ...:
(1) To refuse to ... rent, lease or ... deny to ... any person or ... persons such a housing accommodation because of the race, creed, color, national origin, sexual orientation, ... sex, age, disability, ...or familial status of such person ... or to represent that any housing accommodation ... is not available for ... rental or lease when in fact it is so available.
(3) To print or circulate ... any statement ..., or to make any record or inquiry in connection with the prospective ... rental or lease of such a housing accommodation which expresses, directly or indirectly, any limitation, specification or discrimination as to race, creed, color, national origin, sexual orientation[.]"

no knowledge of plaintiffs' sexual orientations and has sworn to this statement. Further, defendant claims that he never inquired and was never informed by either of the plaintiffs that they were homosexual. Defendant also argues that he had no reason to conclude that either of the plaintiffs were homosexual purely because they were seeking to live together as roommates or referred to one another as girlfriend. Moreover, unlike familial status discrimination, defendant argues that sexual orientation is not an obvious personal attribute that could be ascertained by simply looking at plaintiffs and as such, plaintiffs must prove that defendants knew about this characteristic. See Geraci v. Moddy-Tottrup, Int'l., Inc., 82 F.3d 578 (3d Cir. 1996).

Contrary to defendant's sworn statement indicating that he had no knowledge of plaintiffs' sexual orientations, the record reveals that the issue of whether the defendant knew that the plaintiffs were lesbians at the time he refused them housing is a disputed issue. For this portion of their proof, plaintiffs provide their own testimony that Robinson and defendant had a phone conversation in which he quizzed her regarding who in her household was going to be sleeping in what room and in what bed. Further, Robinson testified at her deposition that defendant asked her who was going to be sleeping in which room and she replied that her son was going to be in one room and she and Swinton were going to share the other room. The defendant then informed Robinson that he still did not understand how it was going to work and asked her if she

was planning on sleeping on the floor. According to Robinson's testimony, she was offended by defendant's line of questioning and informed him that Swinton was her girlfriend, that they were in a romantic relationship and that they would be sleeping in the same bed. Defendant denies Robinson's version of the conversation. These differing versions of the event raise material questions of fact precluding summary judgment on the issue of plaintiffs' sexual orientation claim. See Diebold, 369 U.S. at 654 (The underlying facts contained in affidavits and depositions must be viewed in the light most favorable to the non-moving party).

## CONCLUSION

For the reasons set forth above, I find that plaintiffs have presented sufficient questions of material fact to survive defendant's motion for summary judgment. Accordingly, defendant's motion for summary judgment dismissing the complaint is denied.

**ALL OF THE ABOVE IS SO ORDERED.**

    s/Michael A. Telesca
    MICHAEL A. TELESCA
    United States District Judge

Dated:   Rochester, New York
         March 14, 2008